Good morning. Patrick Carrion on behalf of the Porches. There are a number of things that I'm asking this court to review, so please stop me if you have questions. There are a number of issues that dealt with the court below. The first was that I was going after two defendants, and not all of them are residing in one state, i.e., California. As you may have picked up in reading the documents, I was going after Pilot & Associates. That seems pretty clear from the district court's ruling. Yes. And from the affidavits that were filed. Yes, and unfortunately, even though I agreed to dismiss this other company, you know, I went after Pilot. There was a Pilot & Associates company that evidently, you know, I didn't have the chance to have discovery, but evidently this entity became defunct in 2000, resurrected in 2003, got defunct again, resurrected in 2006, and it's called Catastrophe Management Services. And the court below said, because I was trying to sue Catastrophe Management Services, that I was going after two defendants that didn't reside in the state of California. I informed him. How does that suggest we should reverse? Excuse me? How does what you're saying now suggest we should reverse? Yes, yes. That, again, in order for me to qualify for jurisdiction under 28 U.S.C. Section 1391b1, all defendants need to reside in one state, and I'm only going after one. That's Pilot, and that's in the state of California. So, yes, that decision would have to be reversed, or that finding would have to be reversed. But that wasn't the only basis for the 1391. No, no, no. I'll get into that. That was the first one that they referenced. Under 1391, and if you want me to address that first as opposed to the forum. Well, that's what the district court ended up doing. Yes. They moved to dismiss on grounds of what they call the forum nonconvenience, but they wanted to invoke the. . . Yes. What happened is, yes, we addressed forum nonconvenience initially, and then the court by itself, you know, came up and said, well, I want an analysis of 28 Section 1391. Right. And that's what brought us into, I think, that change. In his ruling, his dismissal was based on 1391 on the grounds that there was. . . It was. . . . personal jurisdiction. That was one of the bases of it, and I certainly want to address that. And then he said, well, and furthermore, this is all supported by the forum selection clause. Forum selection clause, and all of them combined. I mean, you know, I will. . . Well, not exactly. To an extent, and I will address those issues. You say that it was based on 1391. I thought the court said that I would have transferred it if it weren't moot. And 1391 wouldn't moot it, would it? Well, at the very end, there is a reference. If the decision were based on 1391.    .  And then the question of transfer would not have been moot. If they had found jurisdiction under 1391, there would have been a question of forum nonconvenience, which was. . . And that was the question of transferring it. That was the question of transferring it. And so that wasn't moot. So he says right up front it's moot, so he must be doing something else. Well, if I'm understanding your inquiry correctly, what was said at the very end of the opinion. . . I'm talking about the very beginning of the opinion. Then I'm misunderstanding what you were asking me. The very beginning of his decision, his minute order decision. Yes. Had the items not been rendered moot by this order, the Court would have transferred the action under Section 1404, 1404 being you've got the wrong venue, right? 1404 being that he would be ruling that I have the wrong venue. But that also dovetails with the 1391 analysis. Because if you have residence under 1391b1, if you then go to Section C of 1391, they state that if you have residence, if the person is a resident of that State, if that finding is made, then you have venue. And so a 1404 analysis at that point becomes moot. I won't take up any more of your time. Okay. Just in trying to address that, I think that this analysis, this four-page, five-page analysis he did wasn't rendered moot by finding 1404 applies. I think, in fact, that he was mistaken and that when 1391 applies, if you go then to 1391c and you are saying b1 applies and he's a resident, if he's a resident there, then there's no forum nonconvenient. Just on 1391, he was concerned that though these plaintiffs resided in California, the corporation itself really didn't have any connection with the State of California. That's the general and specific jurisdiction analysis, which I'll address right now. The real question is, does it upset notions of fair play and substantial justice to bring this entity into California? The Perkins case is a seminal case that talks about all the administrative things that the entity did in the State of Ohio when all of the activity of mining was taking place in the Philippines. And there was enough administrative activity in Ohio to show general jurisdiction under 1391. The helicopteros claim. As I understood from the affidavits that they filed is that their agents, independent agents, live all over the country. They have some living in California. Correct. Porsches, for example. Correct. They do adjust claims in California. Correct. That's an important point. Yeah, they do. And they make it pretty clear that they adjust claims in California. They're certified or they're registered with the State Insurance Commission. They have a manager that lives up north. Licensed, they have process serving here. And they have some sort of resident manager or whatever that lives in northern California. That's correct, also. The district court said that wasn't enough. Correct. The district court only looked at kind of the administrative part of this and ignored the continuous operations of the company throughout the course of time, dating back from 1994 to the present. The continuous operations is kind of the key analysis here for 1391b1. You are a resident if you have continuous operations. And in this instance, unlike Helicopteros, where nothing was happening in that state, the state of Texas, other than purchasing parts, and the incident that brought up the basis of the action occurred with a helicopter crash in Peru, we have the activity that is the basis of the cause of action occurring here in California. Failure to pay overtime under both federal and state law, as well as violations of the California Labor Code for failing to pay or forcing the employee to pay for the overhead of the employer, failing to pay for all hours worked, meal break, rest break violations. So we have not only a continuous operation over the course of time, but we also have the actual activity that forms the basis of the causes of action occurring in this state. Your time is running out. Your time is clicking down. And let's just assume that you can get over the 1391 issue and you get to the Forum Selection Clause. Why shouldn't that be enforced? Because the court below only evaluated the Forum Selection Clause in a vacuum. They didn't evaluate the entirety of the contract. I think if you look at Engel v. Surgeson. Well, what case says that we look at, you know, the arbitration clauses and all the other clauses that are in that contract? To determine whether or not a court should enforce the Forum Selection Clause. I think Armaderez addresses this. I think Engel addresses this. Well, we look at the Bremen factors in federal court to determine whether or not we're going to enforce the Forum Selection Clause. Understood. Correct? I agree with that. And the cases that are cited just talk about the issue only being the Forum Selection Clause. That's not the only issue in this case. And if the only issue in this case is going to be just the Forum Selection Clause, then you're missing the other 80 percent of the contract. Well, all the district court did, as Judge Fernandez pointed out, is, you know, he said, as I understood it, what he did, if you had gotten over 1391, dismissal would have been appropriate under the Forum Selection Clause as well. Well, if you evaluate the Forum Selection Clause in a vacuum, I don't think Armaderez stands for that. I don't think this Court in Engel did that when it's asked to review an employment contract. This was the request that I made when the motion to dismiss came down. This employment contract has 14 illegal provisions in it. That stands it on its head, doesn't it? Yes, it agrees. The point of the Forum Selection Clause, which is not illegal, is to say you can raise all your issues about the contract. Anything you want to raise, raise it in the forum. In a proper forum. That was selected. Okay. And that's part of the problem. And you say, oh, yeah, but all these things are illegal. Fine. Tell that to the forum. Well, that's part of the problem because what you're doing is you are then encouraging employers to draft these incredibly broad employer-advantaged contracts, including a Forum Selection Clause. The Forum Selection Clause refers directly to the Arbitration Clause. The Arbitration Clause is where a lot of these illegal provisions exist. They go hand-in-hand. As long as the provisions are legal, isn't that the point of a contract? Excuse me? As long as the provisions are legal, maybe, you know, seeing this group arbitration clause, it seems pretty unusual. But as long as provisions are legal, isn't that the point of a contract being offered? But, Your Honor, then it comes down to the severability analysis. I mean, again, are you going to look at a contract in a vacuum or are you going to look at it as a whole document, the whole three or four pages of it? And what this contract does is it gives the advantage to the employer, a tremendous advantage, and it essentially insulates the employer from liability for employee disputes. Are you familiar with a recent case by the Ninth Circuit called Doe v. AOL? Doe v. AOL? Doe v. AOL. I'm not, Your Honor. I'm sorry. I won't get into it then. My time's up. Yes. We'll give you a little bit, a minute or so, for rebuttal. Thank you, Your Honors. Good morning. John Manier, Val Rosenberg, Goldberg and Sabbat for HiLIT. Quite catch-all, but that's okay. Okay. First of all, Your Honors, just to very briefly address this issue about CMS, again, the declaration that was filed with HiLIT's original moving papers explained that the entity that used to be known as HiLIT and Associates changed its name twice. It's now known as CMS, and that is, it was in the complaint. They talked about dismissing them. They never did dismiss them. They weren't denied an opportunity. They were in the case. That's why we analyzed the fact that they don't reside in California. The district court, in the end, seemed to just disregard them. Well, they noted that they don't reside in the states. I mean, they devoted a small paragraph to it. It's obviously not the central part of the decision. It's simply another alternative basis for the decision under 1391. But the real defendant here is HiLIT. Oh, yes, definitely. They're the only ones that were served. They're the only ones that we're actually representing in this court. So they're the ones for which the venue and the form selection clause are primarily germane, as well as the 1404 factors. And to address the 1404 briefly, you know, the district court did say that if it had not been rendered moot by its decision, the court would have transferred under 1404. And, again, the legal standards are, under 1391, a transfer or dismissal would have been mandatory based on improper venue, that it could not have been brought in California. But then the alternative analysis, which covers a lot of the same facts as the 1391 analysis and the form selection clause analysis, is that even if venue was technically proper and it could have been brought in the central district, the convenience of the parties and the witnesses. That's a tough one to rely on, though, in this particular case. Oh, the convenience? Well, you know. If you just go straight to convenience. Again, though, you only have. You guys are litigating tons of cases out here in California. Well, and not now we're not. Well, you were. Those are all pretty old cases. And, again, this is an important fact in terms of venue, because we had, Pilot had an office in Thousand Oaks that had opened because of the Northridge earthquake. And they had a ton of claims. And most of the lawsuits that the plaintiff references involved work done on those claims. So they had a full-time office in Thousand Oaks, which is in the central district. Well, the Northridge earthquake was 15 years ago. And that office closed in 2005. The plaintiff's lawsuit was brought in July of 2007. And the statute is very specific that the venue must be determined as of the filing of the lawsuit. So all that past history, which, as far as the plaintiff's lawsuit is concerned, is ancient history, is legally irrelevant to whether venue is proper at the time the lawsuit is brought. And what the plaintiff keeps sort of jumping over here is that for venue to be proper in the central district, these jurisdictional issues that pertain to residents, they must be satisfied as to the central district, as if it were a separate state, not just in California. So when we talk about the fact that there's a full-time employee, only one, that is full-time in the state, that person is up in the northern district. So that does not establish contacts in the central district. I mean, we didn't move to dismiss on jurisdictional grounds because I will concede, for purposes of argument at least, that that employee up in northern California satisfies jurisdiction in the state. It doesn't satisfy venue down here. Are they licensed in Los Angeles? They're licensed in California. Aren't you licensed in California, excuse a northerner's perspective, in case of the big one? Oh, sure. I mean, in case it happens. And there are people who work here. There were 52 people who earned W-2 wages, 25 of them in central district, in the first seven and a half months of 2007. I thought it was somewhat telling that you didn't rely on that ground as a basis to move the case to Alabama. Well, I've become more convinced of it. Sure. That's because the district court judge picked up on it. Well, I think the fact of it is, and the district court analogized our case, as did we, to the Conjulium case. I'm not even going to try to pronounce the rest of it because it's German with a lot of consonants. But the 1984 decision by this court, Conjulium, et cetera. And that case, you had a substantial sales force in the state, and they basically said that's by itself not enough to establish the general jurisdiction standard, which is basically the same as the continuous physical presence. You're not just opening the door, you're making yourself at home. And having adjusters here, which most of them don't live here, the vast majority don't live here, and they're transient in the sense that they come here, they'll work here. They come here and they do work here. They do your core work here. They do. That's true. There's no question about that. On the other hand, it's not a continuous physical presence. And see, the plaintiff's focus on the core work, the plaintiffs cite this Provident Bank case. And that's the one where, in that case, the party, the defendant, that was fighting jurisdiction, they had bank accounts in Pennsylvania. In fact, they had bank accounts to the point where they could have actually secured loans with property based on bank accounts in the state of Pennsylvania that were continuous. And that was their core business, and it was related to property, and it was very similar to a continuous physical presence in that state. And they found that there was jurisdiction in the district where the case was litigated, and thus the venue was proper. You don't have anything close to that here because your people are doing work here, just as they were in Conjolium. They were doing sales work, which would be considered central, I would think, to any business. And yet, they're transient. They don't live here. They'll adjust a claim, and then they'll leave.  I mean, it would be like me if I'm going to. Your business is bringing agents out here, adjusters out to various states around the country. Adjusters only, right. Right, but to do this work of adjusting for insurance corporate, for insurance. Sure. That is true. But it's not, again, though, it's not, the test, though, is not just do we do some core business out here. Your time is clicking down. Why don't you address, why should the form selection clause be enforced here? Are you familiar with our recent case, Doe v. AOL Inc.? I'm afraid I'm not familiar. You didn't do enough, you didn't do a check before. Oh, I did a check. I just didn't come up. Okay. Maybe I didn't do a good check, but I did a check. I thought I did a fine check. But in any event, I think. Apparently, I didn't do a good enough check either. It happens. This won't be the first time, but this, the Murphy case sets out the factors to analyze the form selection clause. And let's step back and look at the actual facts of this case. As the judges have noted, PILOT does cases, adjusting cases, all over the country. These adjusters, most of them don't do work out here. Most of them are either in Alabama or in neighboring Gulf states. And especially recently with all the horrible hurricanes and other storms, there's been a predominance of work. And our plaintiffs in this case didn't do work in California. They adjusted, they both went to Alabama to orientation for which they were paid wages. And then they went to, one plaintiff went to Orlando, Florida. The other plaintiff went to Louisiana doing hurricane work, and then up in Pennsylvania. And that's where they did the bread-and-butter work. They did not do bread-and-butter work in California. And the form selection clause has some very important language, I think. It says, recognizing that services may be rendered in various states in the United States and elsewhere, and the need for consistency in administering this agreement and the overall relationship between PILOT and employees. And then it explains that that's the basis for having the selection of Alabama as the one form. Because if you didn't have that, this is similar to the Carnival Cruise case, where you have a cruise line that's operating out of Miami, but they leave through a bunch of different ports, including Los Angeles. And they explain that, look, they leave from various ports, and they have a business need for a uniform forum and uniform law that applies to these cases. Otherwise, you could have slip and falls on the boat, and you could have lawsuits in a bunch of different states arising from the same claims. Do you object to this case being reinstated and sent back to Alabama? Well, Alabama is the proper place for the case. The clause does say the circuit court of Alabama. So it specifies the state court as the correct forum, which is why the motion was a forum nonconvenience rather than simply a transfer, because that is what the contract says. I mean, certainly Alabama is the proper forum. These are federal law claims. The bread and butter, I guess, of this lawsuit is a federal lawsuit. It also has California wage and hour claims, labor claims. Whether they apply is a whole other issue. Choice of law issues are involved. Right. Those have been alleged. On the other hand, we wouldn't be in this court if it weren't for the federal claims, because that's the federal question jurisdiction, which the plaintiffs invoked when they filed the complaint in federal court. What's interesting is if they were trying to go on diversity jurisdiction, which they invoked the class action statute, my understanding of this court's precedence, and I can't cite them letter and verse, my understanding is you'd have to show at least one of the plaintiffs had a mountain controversy on their claims of $75,000 or more. So that kind of belies the notion that these are piddly little claims that wouldn't be worthwhile to pursue over in faraway Alabama. And, in fact, there is no evidence that these claims are of such low value that it wouldn't be worthwhile. I think if you look at the factors under Murphy, the clause is enforceable. All right. Thank you for your time, guys. Thank you. We have a minute for rebuttal. The Class Action Fairness Act says that if the aggregate class action is over $5 million, you're in federal court. So it has nothing to do with the individual claim, per se. As far as the form selection clause, I would ask this court to please not condone what this employer did and what other employers are bound to do if you allow this contract to exist as is, and that is this concept of creating an overbearing contract. If you look at this in a vacuum and just apply Bremen to the form selection clause alone, as opposed to expanding your Bremen analysis at least to include the fact that these other 14 illegalities are there, and then look and see how this form selection clause works as part of an overreaching attempt on the part of the employer to put his thumb on the scale in its favor and against the employee. Please don't condone that. Okay. You're over your time. Thank you very much. I appreciate your arguments. The matter is submitted. Our next case for argument is Willow Rorabaugh v. Continental Casualty Company. Thank you.
judges: Fernandez, Paez, Hogan